UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard B. LANKFORD, Defendant–
Appellant.

No. 90–8583.

United States Court of Appeals,
Eleventh Circuit.

March 25, 1992.

George O. Lawson, Jr., Lawson & Thorton, David D. Aughtry, Chamberlain, Hrdlicka, White, Johnson & Williams, Larry D. Thompson, King & Spalding, Stephanie E. Parker, Barbara G. Moon, Thomas L. Washburn, III, Atlanta, Ga., for defendant-appellant.

William P. Gaffney, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before FAY and BIRCH, Circuit Judges, and HOFFMAN *, Senior District Judge.

FAY, Circuit Judge:

This case presents two questions concerning the district court's exclusion of evidence in a criminal prosecution. Defendant–Appellant Richard B. Lankford was convicted on two counts of extortion and two counts of filing false income tax returns. During defense counsel's cross-examination of the government's chief witness against Lankford, the district court precluded a line of questioning by defense counsel purporting to show motive for false testimony on behalf of the government witness. In addition, the district court excluded expert testimony offered by the defense to show that Lankford might reasonably have believed that a $1500.00 check he received was a gift and therefore not taxable income. For the reasons that follow, we disagree with the exclusion of evidence in both instances.

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

## I. *Procedural History*

Richard Lankford was indicted on October 5, 1989 on twenty-one counts of extortion and two counts of extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951. In addition, the indictment alleged four counts of willfully filing and subscribing false income tax returns, in violation of 26 U.S.C. § 7206(1). On March 28, 1990, a jury convicted Lankford on two counts of extortion and on two counts for filing false income tax returns. The jury acquitted Lankford on one count of attempted extortion and failed to reach a verdict on the remaining counts. A post-verdict motion for acquittal or a new trial was denied on April 20, 1990, and on June 4, 1990 Lankford filed a timely notice of appeal.

## II. *Factual History*

### A. Extortion Charges

Richard Lankford served as the Sheriff of Fulton County, Georgia from January 1985 [1] until he was convicted in the district court in 1990. The extortion charges against Sheriff Lankford involve a series of payments Lankford allegedly received from Jack LeCroy from 1985 through 1988. LeCroy owns a majority interest in the catering company, L & G Catering ("L & G"), that received a contract to provide food services to the Fulton County Jail.[2] LeCroy testified that he believed Sheriff Lankford had awarded L & G the contract and that Lankford had the power to renew or to cancel the contract.

During the years in which L & G operated at the Fulton County Jail, LeCroy testified[3] that Sheriff Lankford periodically asked him for money. While Lankford never threatened to terminate L & G's contract with the county, LeCroy testified that he paid Lankford because he was afraid of losing his contract. Evidence was presented that Lankford solicited and received payments ranging in amount from $230 to $2000, with most payments being close to $1000.[4]

### B. Income Tax Charges

One of the charges for filing false income tax returns was based upon a $1500 payment received by Lankford in 1984. Lankford resigned his position with the Fulton County Sheriff's office in 1984 in order to run for Sheriff in the November 1984 election. Evidence was presented that a sergeant at the Fulton County Jail solicited an inmate, Wesley Merritt, for a contribution to Lankford's campaign.[5] Merritt testified that he contacted his niece, Sandra Hudson, who was the manager of a liquor store, and requested that she write a check for $1500 from the store account. Hudson testified that an individual claiming to be Richard Lankford came to the liquor store to pick up the check, and requested that it be made out to his wife, Jacqueline. Hudson made out the check accordingly, but did not indicate on the check that it was intended as a campaign contribution. Lankford testified that he never picked up the check from the liquor store, but that he received the check from campaign workers who indicated it was a gift, to help his family meet expenses while he was unemployed.

---

1. Prior to his election as Sheriff, Lankford served as a deputy in the Fulton County Sheriff's Department for nine years.

2. L & G was awarded the one-year food service contract for the jail in the spring of 1985. Its contract with the county was renewed for two additional one-year periods, and it continued to provide food service thereafter on a month-to-month basis until November 1, 1989.

 LeCroy testified that when the contract was first awarded in 1985, the inmate population at the jail was approximately 850 and that the population nearly tripled by November 1989.

3. LeCroy testified before a grand jury and at trial under a grant of use immunity.

4. LeCroy's testimony that he made payments to Lankford was supported by the testimony of LeCroy's former bookkeeper, Doris Anderson, who testified that she cashed checks for LeCroy in the amounts he claimed he paid to Lankford. In addition, checks that were drawn on the L & G account were admitted into evidence.

5. Merritt testified that he had no direct contact with Lankford concerning the campaign contribution.

### III. Discussion

#### A. Cross–Examination of LeCroy

■ A district court's evidentiary rulings may only be disturbed on appeal where there appears a clear abuse of discretion. *United States v. Rodriguez,* 917 F.2d 1286, 1289 n. 6 (11th Cir.1990). Further, this circuit has held that the trial court has broad discretion under Federal Rule of Evidence 611(b) to determine the permissible scope of cross-examination. *United States v. Jones,* 913 F.2d 1552, 1564 (11th Cir. 1990) (citing *United States v. Bent,* 707 F.2d 1190, 1194 (11th Cir.1983), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984)).

■ The district court's discretion in limiting the scope of cross-examination is subject, however, to the requirements of the Sixth Amendment. *Greene v. Wainwright,* 634 F.2d 272, 275 (5th Cir.1981);[6] *United States v. Williams,* 592 F.2d 1277, 1281 (5th Cir.1979); *United States v. Crumley,* 565 F.2d 945, 949 (5th Cir.1978). The right of confrontation guaranteed by the Sixth Amendment includes the right of cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). Cross-examination has traditionally been allowed for the purpose of impeaching or discrediting the witness. *Id.* at 316, 94 S.Ct. at 1110. In particular, the exposure of a witness' motivation in testifying has been labelled by the Supreme Court as an important function of the Sixth Amendment right to cross-examination. *Id.* at 316–17, 94 S.Ct. at 1110–11; *United States v. Calle,* 822 F.2d 1016, 1020 (11th Cir.1987); *United States v. Andrews,* 765 F.2d 1491, 1501 (11th Cir.1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *Jenkins v. Wainwright,* 763 F.2d 1390, 1392 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 730 (1986).

"This court has long recognized the particular importance of searching cross-examination of witnesses who have substantial incentive to cooperate with the prosecu-

tion." *Jenkins,* 763 F.2d at 1392 (citations omitted). The importance of such cross-examination does not depend upon whether or not some deal in fact exists between the witness and the government. *Greene,* 634 F.2d at 276.

> What counts is whether the witness may be shading his testimony in an effort to please the prosecution. "A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception."

*Id.* (quoting *Burr v. Sullivan,* 618 F.2d 583, 587 (9th Cir.1980)). And further, where the witness sought to be cross-examined is the government's "star" witness, " 'providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased.' " *Id.* at 275 (quoting *United States v. Summers,* 598 F.2d 450, 460 (1979)); *see also Calle,* 822 F.2d at 1020; *Haber v. Wainwright,* 756 F.2d 1520, 1522 (11th Cir.1985).

■ Therefore, while the discretion of the district court in ruling on the admissibility of evidence is entitled to a great deal of deference by this court, this discretion is somewhat narrower where the district court limits a defendant's right to cross-examine witnesses against him. *See United States v. Beale,* 921 F.2d 1412, 1424 (11th Cir.1991) ("*Subject to the Sixth Amendment,* the district court has the discretionary authority to limit cross-examination." (emphasis added)). Unless the defendant has been permitted sufficient cross-examination to allow a jury to adequately assess the witness' credibility, the district court's limitation of cross-examination will be in error. *Id.*

■ The district court here limited Lankford's cross-examination of the chief government witness against him, Jack LeCroy. Lankford sought to elicit from LeCroy, as evidence of a possible motive for LeCroy's cooperation with the prosecution, the fact that LeCroy's sons had been ar-

**6.** The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

rested by state authorities for the sale of twenty pounds of marijuana.[7] The district court refused to allow cross-examination concerning the drug arrests, concluding that it was too prejudicial. In addition, the district court questioned the likelihood that LeCroy had reason to fear a federal investigation of the state charges against his sons. We cannot agree.

Notwithstanding the fact that LeCroy had made no deal with the government concerning a federal investigation into his sons' marijuana arrest, his desire to cooperate may have in fact been motivated by an effort to prevent such an investigation.[8] We cannot imagine a much stronger motive for testifying on behalf of the government than the desire to protect one's children. A reasonable juror could have concluded that LeCroy's testimony was the result of his desire to protect his sons and to obtain federal assistance in avoiding a subsequent federal prosecution against them. In addition, a reasonable juror could conclude that LeCroy might even have hoped that should things go "well" for the government in the Lankford case, he could later solicit help from the federal government in his sons' state case. The probative value of such strong evidence of possible motive outweighs any possible prejudice to LeCroy. While the jury may not have believed that LeCroy was motivated by fear of a subsequent federal investigation of his sons' affairs, the fact of the state arrest and the fact of a possible federal investigation were crucial to the jury's assessment of LeCroy's credibility.[9] Accordingly, the exclusion of this evidence erroneously limited Lankford's right, guaranteed by the Sixth Amendment, to cross-examine LeCroy for possible motive or bias.[10]

7. The evidence elicited from LeCroy outside the presence of the jury revealed that LeCroy's two sons had been arrested for possession with intent to distribute 20 pounds of marijuana. The arrests occurred at Papa's Country Buffet, a restaurant operated by LeCroy and his sons. The record reveals that LeCroy's sons had entered guilty pleas to the state charges and that they were on probation at the time of the Lankford trial.

We note that, although the arrests of LeCroy's sons occurred at an establishment operated by LeCroy, there appears to be no evidence linking LeCroy to the offenses committed by his sons.

8. It is common knowledge that "joint task forces" exist between state and federal governments in which they work together, cooperating and sharing information. Furthermore, in some instances, the state and federal governments decide together in which court or courts charges will be brought. In cases where charges have already been brought in state court, it is not unusual for charges to be refiled in federal court after law enforcement officials have deemed the results of the state proceedings to be less than satisfactory. State probation sentences provide excellent examples of those situations that have led to subsequent federal proceedings against defendants that had previously been tried in state courts. It is LeCroy's possible fear that subsequent federal action might have been taken against his sons, together with his desire to protect them, that may have motivated LeCroy to testify for the government. Such a conclusion would be further supported by the fact that LeCroy's cooperation with the government appears to have begun about the time when LeCroy was admittedly worried about his sons and the charges they were facing.

9. Although the defense did have the opportunity to bring out the fact that LeCroy had been given use immunity to testify, thereby implicating LeCroy's possible motivation in seeking to protect himself from charges connected to Lankford, inquiry into the grant of use immunity would not have allowed the jury to assess LeCroy's credibility to the same extent or in the same manner as evidence of the arrests of his sons. After all, while LeCroy's testimony could not be used against him, LeCroy could still be prosecuted for the acts about which he was testifying. Moreover, while a reasonable jury could have concluded that LeCroy was not motivated by any desire to protect himself, it could simultaneously have concluded that LeCroy was testifying out of a desire to protect his sons. In fact, a jury could have concluded that LeCroy chose to undertake a risk of prosecution in order to assist and protect his sons.

10. In addition, as further motive for LeCroy's cooperation with the government, Lankford sought to establish that LeCroy feared investigation into losses he had claimed on recent tax returns. We agree with the district court's exclusion of this line of questioning.

The evidence of LeCroy's tax reporting is distinguishable from the evidence concerning the drug arrest of LeCroy's sons because any contention that LeCroy feared a tax investigation is highly speculative. There is simply no indication that LeCroy had any reason to fear investigation by the Internal Revenue Service. In fact, testimony outside the presence of the jury established that LeCroy had been audited in 1982 with no change made to his return. Without any foundation whatsoever to support a possi-

## B. Expert Witness

 In determining whether the district court erred in excluding testimony by an expert witness, we will only reverse where there is a clear abuse of discretion. *See Rodriguez*, 917 F.2d at 1289 n. 6. We note, however, that "where the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *United States v. Garber*, 607 F.2d 92, 99 (5th Cir.1979) (en banc). Here, the district court determined that the tax expert offered by the defense could not testify concerning the reasonableness of Lankford's conclusion that the $1500 check he received was a gift rather than taxable income. Again, we cannot agree.

 The Supreme Court has recently determined that a subjective "good-faith misunderstanding of the law or a good-faith belief that one is not violating the law" can negate the statutory willfulness requirement of criminal tax offenses. *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 609–11, 112 L.Ed.2d 617 (1991).[11] Such a question of whether a defendant believed in good faith that he was not violating the tax law is for the jury.[12] *See id.* 111 S.Ct. at 611. Here, the statute under which Lankford was convicted requires willfulness on the part of the individual who files a false tax return.[13] It remained for the jury, then, to determine whether Lankford willfully failed to report as income the $1500 check he received.

Any evidence concerning the reasonableness of Lankford's belief that the $1500 he received was a gift rather than taxable income is relevant to the determination of whether Lankford willfully violated the tax laws. The Supreme Court has recognized that "the more unreasonable the asserted beliefs or misunderstandings [of a defendant] are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws and will find that the Government has carried its burden of proving knowledge." *Cheek*, 111 S.Ct. at 611–12. It is thus highly probative for the defense to show that the defendant's belief—whether or not mistaken—was reasonable; evidence of a belief's reasonableness tends to negate a finding of willfulness and to support a finding that

ble conclusion by the jury that LeCroy feared investigation by the IRS, admission of such evidence would be more prejudicial than probative.

"[T]he Sixth Amendment does not require unlimited inquiry into the potential bias of a witness." *United States v. DeParias*, 805 F.2d 1447, 1452 (11th Cir.1986) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931)), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied. *Id.; United States v. Burke*, 738 F.2d 1225, 1227 (11th Cir.1984). Where, as here, a witness' motive for testifying may be exposed through alternative lines of questioning, the district court's refusal to allow prejudicial inquiry into motive that is grounded in nothing more than speculation is not in error. Here, LeCroy's motivation to protect himself had been sufficiently explored through inquiry into the use immunity that the government had granted LeCroy in order to obtain his testimony.

On the other hand, the district court permitted no inquiry into the other distinct motive that LeCroy may have had for testifying, that of protecting his sons. Inquiry into this motive was supported by the state arrest of LeCroy's sons on drug charges. That arrest was a matter of record, and it served as a factual foundation for the possible conclusion by a jury that LeCroy feared a federal investigation of the state charges.

**11.** We note that the district court did not have the benefit of the Supreme Court's recent discussion of this area of the law when it tried the case.

**12.** In fact, in criminal tax cases involving willfulness, "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision." *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991).

**13.** The applicable section declares that an individual will be guilty of a felony if he:

*Willfully* makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter....

26 U.S.C. § 7206(1) (emphasis added).

the defendant's belief was held in good faith.

At trial, Lankford testified that he subjectively believed that the $1500 check he received was a gift and that gifts need not be reported as income. The defense also presented evidence revealing that Lankford was facing personal financial difficulties while he was running for office, that members of the community were aware of these difficulties, and that Lankford received cash and the $1500 check from campaign workers, together with an explanation that the money was being provided for his family in recognition of the financial difficulties that the campaign had imposed on him and his family. Expert testimony of the reasonableness of Lankford's belief would be highly relevant to the assessment of whether Lankford willfully violated the tax laws. Thus, the critical issue here is whether, under facts such as those presented to the jury, it is reasonable for a political candidate to treat certain monies received during a campaign as political contributions, while treating other monies as gifts donated to assist him with living expenses incurred during the campaign. Most jurors would simply lack the specialized knowledge, background, and experience needed to assess the reasonableness of the gift/income tax interpretations unique to a candidate's finances during a political campaign, particularly where the candidate must resign his existing position in order to run for office.[14]

The gift/income tax opinion of the defense's expert witness could have had a powerful impact on the issue of Lankford's willfulness, the critical element in Lankford's defense to Count 24. Lankford testified that he believed the $1500 check was a gift that was not taxable; his expert's testimony revealed that a legitimate and well-founded legal analysis would have supported the reasonableness of that belief. By disallowing expert testimony on the gift/income issue, the trial court deprived Lankford of evidence showing that his asserted state of mind was reasonable. Accordingly, we hold that the exclusion of expert testimony on this issue was error. See Garber, 607 F.2d at 99.

The trial court's error was further compounded, however, because the government was permitted to elicit an expert opinion from Lankford's tax preparer, called as a witness by the government.[15] That expert testimony was used to establish that the reasonable and proper course of conduct where "campaign contributions" have been used for personal expenses would have been to report that amount as income. On this issue, however, the defense was not permitted to offer the testimony of its expert, a certified public accountant, certified financial planner, and tax lawyer. This expert opinion was sought to show, among other things, that it would have been just as reasonable to treat the $1500 check as a gift.[16] Because the government was allowed to offer expert testimony on

**14.** Although the defense does not argue that the law establishing the gift/income distinction is legally vague, the categorization of items as either gifts or income is rarely a simple matter. In fact, experts in the field of taxation often hold differing, well-grounded positions with respect to whether specific items are to be classified as either gifts or income under the tax laws. These conflicts result from sophisticated applications of the tax laws to a myriad of scenarios that often differ only as to the rendition or interpretation of the facts underlying the disputed classification. In the context of a political campaign, the complexity in the application of the tax law is seen when a "campaign contribution" is not received directly from the donor and no expression of donative intent is made, thereby requiring the gift/income distinction to be made without any direct knowledge of the donor's actual intent. That is, the available

facts must be studied to determine whether the contribution was intended to personally assist the candidate during the course of his campaign or to assist the candidate's political campaign and political goals.

**15.** Although Lankford's tax preparer was never qualified as an expert, he held an accounting degree and had been preparing tax returns for over twenty years. Moreover, the trial court allowed the prosecution to question him as if he had been qualified as an expert.

**16.** The defense also sought to have its expert testify concerning the distinction between gifts and taxable income under the Internal Revenue Code. Because it is for the judge to explain the law to the jury, we agree with the district court's refusal to allow such testimony.

the reasonable tax implications of a "campaign contribution," but the defense was not, we hold that the exclusion of the defense's expert testimony, submitted in rebuttal, was error. It is an abuse of discretion "to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue." *United States v. Sellers*, 566 F.2d 884, 886 (4th Cir.1977); *see also United States v. Parshall*, 757 F.2d 211, 213–14 (8th Cir. 1985); *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1140–41 (3d Cir.1983).

### C. Harmless Error

#### 1. *Cross–Examination of LeCroy*

■ Having found that the district court erred in limiting the cross-examination of LeCroy, we must next determine whether that error was "harmless beyond a reasonable doubt." *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). In making this determination, a "host of factors" are to be considered, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* Assuming, as we must, that the damaging potential of LeCroy's cross-examination would have been fully realized, *see id.*, we simply cannot conclude that the limitation of the defense's cross-examination of LeCroy was harmless beyond a reasonable doubt.

LeCroy's testimony on the counts involved in this appeal appears to have been crucial to the government's case. It was LeCroy's testimony that contradicted Lankford's account of the nature of the transac-

tion involved in Counts 18 and 27. It is true that there was evidence other than LeCroy's testimony that showed that Lankford had been wired $2,000 in Las Vegas, but that fact was never disputed by Lankford. Lankford simply argued that the payment from LeCroy was an unsolicited loan that was later paid back; LeCroy's testimony was the only evidence presented to show that the payment was not a genuine loan but the result of extortion. Similarly, LeCroy's testimony appears to have been the critical evidence used to convict Lankford of Count 20.[17]

Without LeCroy's testimony, the strength of the government's case against Lankford on the counts to which LeCroy testified is insufficient for this court to conclude that the district court's limitation on cross-examination was harmless beyond a reasonable doubt. Indeed, in ruling upon a motion for bond and release pending appeal, the trial judge recognized as much: "LeCroy's testimony is the heart of the government's case. If the defense were able to impeach LeCroy successfully, the verdict in this action could very well have differed." (R1:59 at 4).[18]

#### 2. *Expert Witness*

■ Similarly, we simply cannot conclude that the district court's exclusion of the defense expert's testimony was harmless. Although Lankford did state that he believed the $1500 check did not need to be reported, the district court did not allow him to present evidence to the jury to explain why that belief would have been reasonable. The government, however, was allowed to pose a hypothetical question to a tax preparer concerning whether the proper course of conduct should have been to report the $1500 as income. Given the possible construction of the facts by the jury and given the defense's inability to present expert testimony to rebut the ex-

**17.** Although Henry Wilson testified that he witnessed Lankford receiving something green from LeCroy in the hallway of the old Fulton County Jail, Wilson's relationship to the LeCroys and his strong sense of loyalty to them makes his testimony insufficient to convince us

that the trial court's error was harmless beyond a reasonable doubt.

**18.** We note again that Lankford was convicted on only four counts of the twenty-seven included in the indictment. The question of LeCroy's credibility can hardly be overemphasized.

pert opinion elicited by the government, we simply cannot conclude that the trial court's error was harmless. The weight to be given to expert testimony is within the province of the jury. However, fairness demands that if experts are presented, the jury must receive a full presentation on both sides of an issue. We cannot predict or guess what a jury will do. But, the excluded testimony of the expert was extremely relevant to the reasonableness of Lankford's decision to treat the $1500 as a gift and not report it as income. Given the critical importance of the reasonableness issue in the determination of willfulness, we find that the trial court's error could have had a substantial impact on the outcome of the trial. If the jury had been permitted to consider the excluded testimony, the jury's verdict may well have been different.

## IV. *Conclusion*

For the reasons set forth above, we REVERSE the district court's exclusion of cross-examination concerning the drug arrest of Jack LeCroy's sons. In addition, we REVERSE the exclusion of expert testimony assessing the reasonableness of Richard Lankford's conclusion that a $1500 check was a gift rather than taxable income, and REMAND for a new trial.[19]

HOFFMAN, Senior District Judge, dissenting:

Because I firmly believe, on both issues the majority addresses, that the district court was correct in its rulings and, even if incorrect, did not abuse its discretion or commit reversible error, I feel compelled to dissent. The majority first examines whether the district court committed error by prohibiting the defendant from cross-examining LeCroy about the arrest of his two sons on marijuana charges. The ma-

jority held that it did. In ruling in this manner, the majority seemingly ignores the mandates of *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

The *Van Arsdall* Court addressed two issues: (1) whether the trial court's limitation of the cross-examination of the state's witness violated the Confrontation Clause and (2) whether such a violation could be found to be harmless error. The Court answered both questions in the affirmative.

Addressing the first issue, the Court recognized that the Confrontation Clause does not prevent

a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 679, 106 S.Ct. at 1435. The Court goes on to emphasize that the defense is not entitled to cross-examination "that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* The Court concluded that for the defendant to prove a violation the trial court must have prevented the defendant "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors ... could appropriately draw references relating to the reliability of the witness." *Id.* at 680, 106 S.Ct. at 1436 (quoting *Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)).[20]

Finding that the trial court committed a constitutional error, the Court then turned

19. The appellant raises two additional issues, alleging discrimination against prospective black jurors in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and asserting error in the district court's answers to jury questions in the course of deliberations. Because we are remanding for a new trial, we need not reach these issues.

20. I agree with Justice White's concurrence in the *Van Arsdall* case where he argued that the curtailment or limitation of the cross-examination of a witness should not be a violation of the Confrontation Clause when the action "has no significance whatsoever in terms of the outcome of the trial." *Van Arsdall,* 475 U.S. at 685–86, 106 S.Ct. at 1438.

to whether the error was harmless. In its discussion, the Court emphasized that "the Constitution entitles the criminal defendant to a fair trial, not a perfect one," *id.* at 681, 106 S.Ct. at 1436, and that the harmless error doctrine focuses the criminal process on the "underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Id.; see also Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). The Court then in remanding the case outlined the factors to consider in determining whether the *Chapman* reasonable doubt test [21] had been met,

> includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438. These ideas first propounded by the *Van Arsdall* Court should control the case before us.

### I. *Cross–Examination of LeCroy*

A jury convicted Richard Lankford of two counts of extortion and two counts of income tax fraud. Count 18 charged Lankford with the extortion of a $2,000 wire transfer from LeCroy while Lankford was on a trip to Las Vegas. Count 27 charged Lankford with the failure to report this transaction on his 1987 federal tax return.[22] Neither Lankford nor LeCroy disputes that $2,000 was wired to Las Vegas. Furthermore, Doris Anderson, LeCroy's bookkeeper, David Gearon, an employee for LeCroy, and Western Union receipts all confirm the transaction. Essentially, only one fact is in dispute; Lankford insists that the $2,000 was a "temporary loan" made by LeCroy, which he allegedly repaid in cash to LeCroy

when he returned from Las Vegas two weeks later. LeCroy, on the other hand, denies that there was ever any reference to a "loan" or "temporary loan" and further denies that Lankford repaid or tendered any portion of the $2,000. Obviously, either Lankford or LeCroy is not telling the truth. The jury accepted LeCroy's statement and rejected Lankford's explanation.

Count 20, the second extortion count, charged Lankford with receiving $650 in cash from LeCroy in the hallway of the old Fulton County Jail. LeCroy testified to the occurrence of this event and his testimony was corroborated by the eyewitness account of one of LeCroy's employees, Henry Wilson. Lankford denied receiving the money. Again, the jury chose to convict.

The majority has chosen to reverse the district court because of that court's refusal to allow the cross-examination of LeCroy about the arrests of his two sons. LeCroy's two sons had been arrested by the Dekalb County police for possession of twenty pounds of marijuana with intent to distribute. Both of the sons were on probation at the time of Lankford's trial. By reversing the trial court, the majority would have us visit the sins of the two sons upon the credibility of the father who, prior to testifying before the grand jury and petit jury, had been granted use immunity as to anything connected with Lankford. With all due respect, I cannot agree that this evidence should be admitted.

The district court's decision to exclude the testimony may only be disturbed on appeal where there appears a clear abuse of discretion. *United States v. Rodriguez,* 917 F.2d 1286, 1289 n. 6 (11th Cir.1990). A court may restrict cross-examination as long as the jurors receive sufficient information to assess the credibility of the witness. *United States v. Leavitt,* 878 F.2d 1329, 1339 (11th Cir.), *cert. denied,* 493

---

21. In *Chapman v. California* the Supreme Court stated that an error is harmless if the prosecution can "prove beyond a reasonable doubt that the constitutional error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

22. Count 24, the other tax fraud charge, in no way involves the testimony of LeCroy and will be addressed later.

U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). Furthermore, the crux of the test set out in *Delaware v. Van Arsdall, supra,* is that there is no violation of the Sixth Amendment unless "the excluded testimony would have affected the jury's impression of the witness' credibility." *Leavitt,* 878 F.2d at 1339 (citing *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436). Finally, the *Van Arsdall* Court clearly stated that the district court has wide latitude to limit cross-examination "that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435.

The defense in this case failed to present one scintilla of evidence that LeCroy testified in the hope of somehow benefitting his sons. Neither the proffer offered by the defense (R12:44–47) nor the actual cross-examination of LeCroy (R8:180–81) even hints that LeCroy aided his sons by testifying.[23] This complete lack of evidence makes it impossible to believe that LeCroy expected to aid or did aid his sons. Of additional concern is that the Dekalb County police, not the Fulton County personnel involved in this case, made the arrests. The majority's attempts to raise the specter of "joint task forces" between federal and state authorities is simply unbelievable in a case of this nature. As opposed to this speculation, the record indicates that the major motivating force, other than to tell the truth, behind LeCroy's testimony was the grant of use immunity, prior to testifying before the grand jury and petit jury, as to anything connected with Lankford.[24]

This result becomes even more compelling in light of the abuse of discretion standard. The majority fails to cite a single case attributing bias to a witness from an association with someone in no way connected to the subject of or the parties involved in a case. Conversely, the Eighth Circuit has held that a district court did not abuse its discretion in preventing cross-examination on whether a witness' father was a federal parolee. *See United States v. Witschner,* 624 F.2d 840, 845 (8th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980).[25]

Moreover, from reading the majority opinion, one would think the trial court arbitrarily decided to limit the cross-examination of LeCroy. The record indicates just the opposite. The trial judge allowed an expansive cross-examination, limiting it

---

**23.** The defense did succeed in revealing to the jury that LeCroy's sons were on probation. The following question and answer is in the record:

Q. Did you have a particular reason why you wanted the government not to look into your affairs?

A. [LECROY] Well, I knew I had been paying this money to Mr. Lankford for one thing, if that's what you are alluding to, and I think what you are alluding to is my boys has [sic] been on probation. Is that what you are alluding to?

R8:180–81.

**24.** In note 10, *supra,* the majority distinguishes the exclusion of the line of questioning on a possible IRS investigation from that on the marijuana convictions. The majority writes, "where, as here, a witness' motive for testifying may be exposed through alternative lines of questioning, the district court's refusal to allow prejudicial inquiry into motive that is grounded in nothing more than speculation is not in error." This argument can easily be turned to support the argument of this dissent. For I ask, what is the very attenuated evidence of the marijuana convictions other than "prejudicial inquiry into motive that is grounded in nothing more than speculation," where the jury has sufficient evidence in the form of a grant of immunity from which to access the possible motive or bias of the witness?

The majority finds that LeCroy's motive to protect himself is different than the motive to protect his sons. The majority concludes that the testimony focusing on LeCroy's use immunity was sufficient to satisfy the Sixth Amendment as to the motive to protect himself, but not as to the motive to protect his sons. The case law is clear, however, that "a court can restrict the scope of ... cross examination as long as the jurors receive sufficient information to assess the credibility of the witness." *United States v. De Parias,* 805 F.2d 1447, 1452 (11th Cir.1986) (citing *United States v. Burke,* 738 F.2d 1225, 1227 (11th Cir.1984)). The use immunity testimony provided the jury with ample evidence from which it evaluated the general credibility of LeCroy. Consequently, any inquiry into the unrelated arrest and prosecution of LeCroy's sons is speculative, irrelevant, and prejudicial.

**25.** The Eighth Circuit although finding the limitation of the cross-examination "troublesome" apparently felt compelled to uphold the district court because of the abuse of discretion standard. *See United States v. Witschner,* 624 F.2d 840, 844–45 (8th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980).

only after hearing the proposed testimony outside the presence of the jury. This court has repeatedly held

> that a trial judge may limit cross-examination without infringing the defendant's sixth amendment rights where "(1) the jury, through the cross-examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and (2) the cross examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased."

United States v. Calle, 822 F.2d 1016, 1020 (11th Cir.1987) (quoting United States v. Summers, 598 F.2d 450, 461 (5th Cir.1979)); see also United States v. Burke, 738 F.2d 1225, 1227–28 (11th Cir.1984) (finding no Sixth Amendment violation where jury could adequately gauge credibility and assess possible motive or bias from the testimony solicited from the witness); United States v. Haimowitz, 706 F.2d 1549, 1559 (11th Cir.1983) (holding that there was no abuse of discretion where defense counsel had opportunity to expose facts from which jury could draw fair inferences regarding credibility of witness), cert. denied, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). The lengthy testimony of LeCroy on both direct and cross-examination about the grant of immunity and his cooperation with the government certainly allowed the defendant to argue bias on the part of LeCroy and, likewise, was sufficient for the jury to weigh LeCroy's credibility. Accordingly, both the test set out by this Circuit and the earlier test enunciated in Delaware v. Van Arsdall, supra, are satisfied.

Finally, even if the trial court committed an error which constituted an abuse of discretion, such error does not rise to the level of reversible error. It is inappropriate to reverse a lower court conviction on account of errors which do not affect the substantial rights of the party asserting that error. 28 U.S.C. § 2111; Fed. R.Crim.P. 52(a).

In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court stated that an error is harmless if the prosecution can "prove beyond a reasonable doubt that the constitutional error complained of did not contribute to the verdict obtained." Id. at 24, 87 S.Ct. at 828. The Supreme Court has made clear that Confrontation Clause violations are subject to harmless error. See Arizona v. Fulminante, —— U.S. ——, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991). The Fifth Circuit in United States v. Lay, 644 F.2d 1087, 1091 (5th Cir. Unit A, May 1981), cert. denied, 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172 (1981), stated that "where the trial judge erroneously excluded evidence, [the court] must first determine what the evidence would have been and then determine whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted." Later cases have clarified that factors in asserting harmless error are "the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." United States v. Lang, 904 F.2d 618, 626 (11th Cir.1990) (quoting Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438).

The most that can be discerned from the record is that LeCroy's sons were arrested for possession of twenty pounds of marijuana with intent to distribute. Two points convince me to vehemently disagree with the majority's holding that the exclusion of this evidence was not harmless error. First, as previously pointed out, the jury was well aware that LeCroy was testifying under a grant of use immunity. If the purpose of raising the sons' convictions is to establish bias, how can you create any more question of bias in a juror's mind than by showing that by testifying the witness is avoiding prosecution for the very crimes with which the defendant is charged? [26] Thus, admitting this evidence would clearly be cumulative in nature.

**26.** The recent high-profile criminal trials of John M. Poindexter and Oliver L. North demon-

Second, Lankford went to trial charged with 26 counts. The jury chose to convict on four counts related to only two transactions. Both of these transactions were corroborated by other witnesses or independent evidence. This indicates that when the question of convicting came down to an issue of whether Lankford or LeCroy was telling the truth the jury refused to convict. Consequently, because the jury already refused to believe LeCroy when it was simply his word against Lankford's, any additional evidence going to the bias of LeCroy would have no effect.

A defendant inevitably will be able to raise errors on appeal in any criminal case, especially one of this length and magnitude. The criminal justice system cannot become bogged down in alleged errors that have absolutely no affect on the jury's perception of a witness or on the outcome of the trial. Therefore, I argue that the trial court was correct in its ruling, did not abuse its discretion, and, even if it did, any error was harmless.

## II. Cross–Examination of Expert Witness

The second issue the majority addresses is whether the trial court erred in limiting the testimony of defendant's expert witness, Fred Tokars. The excluded portion of Tokars' testimony is relevant only to Count 24 which charged the defendant with the failure to report the $1500 check from the East Side Liquor Store as income on his 1984 income tax return. The defense offered Tokars' testimony to support Lankford's argument that he believed the $1500 was a gift to him and his family. As with the limitation of the cross-examination of LeCroy, I again cannot agree that the trial court committed error in excluding the evidence. Furthermore, I emphatically contend that all of the possible errors of the trial judge should be considered harmless error.

At trial, the defense presented a lengthy proffer of Tokars' testimony. The questions in issue appear to be the following:

Q. Assuming that those facts are true,[27] do you have an opinion as to whether or not that check was a gift and therefore not includable in income and not subject to taxation, or whether or not it was a campaign contribution that was converted to Richard Lankford's personal use and thus income subject to taxation?

A. [TOKARS] My opinion would be that that would be a gift not subject to taxation.

\* \* \* \* \* \*

Q. And what's the basis of that opinion?

A. Well, it appears that none of the parties expressed their intent, so what I would do is fall back on trying to look at their conduct and trying to infer intent. It doesn't appear as though Sheriff Lankford himself solic-

---

strate the difficulty of prosecuting a witness for crimes which are related to testimony given under a grant of use immunity. *See United States v. North,* 910 F.2d 843, *modified,* 920 F.2d 940 (D.C.Cir.1990); *United States v. Poindexter,* 951 F.2d 369 (D.C.Cir.1991); *see also Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**27.** In its hypothetical to Tokars, the defense requested that he assume the following:

1) Lankford supports a wife and two children.
2) Lankford is running for sheriff on a platform of expanding the role of the sheriff.
3) It is public knowledge that Lankford gave up his job to run for sheriff.
4) Lankford has little income during the campaign to support his family.
5) Lankford has a campaign manager and treasurer to keep track of campaign contributions.
6) All checks to the campaign are made out to the Sheriff Lankford Campaign and deposited in a separate bank account used only for campaign expenses.
7) Liquor stores are pleased with Lankford's campaign.
8) Eastside Liquor Store gave a check to Mrs. Lankford that was made payable to Mrs. Lankford.
9) Mrs. Lankford deposited the check into the family's joint personal checking account and used it for car insurance and other items.

R12:167–69. Before attempting to ask the hypothetical with the jury present, the defense modified assumption #8 to comport with Lankford's testimony.

ited a campaign contribution. The check was obviously written out to a personal individual, that being Mrs. Lankford, so I think that you could infer that the payor's intent was that it be a gift.

Also because this occurred at a time when most people in the community knew that the sheriff did not have a job and that he, of course, gave up his job as a deputy sheriff to run for office, they well knew that he probably needed money to live on. Then you could take a look at the actions of the payee or the recipient of the check, and it's no doubt that the recipient of the check treated it as a gift. Mrs. Lankford deposited the check in her personal checking account and used the money for—to buy insurance on the car and to use the car. And so I, from looking at the parties, their intent, you have to infer that it's a gift.

R12:169–70.

The majority discusses this testimony as if the expert was deciphering some thorny issue in the tax code—one which laymen could not understand. I believe just the opposite. Here the expert is testifying as to the mental processes of the defendant's mind. The expert is attempting to ascertain what an individual is thinking at a given time, something for which no scientific method has ever been devised. This count does not involve a complex tax issue. Instead this count involves the most common issue of all, who is telling the truth.

The defense and the prosecution presented the jury with two completely different versions of the transaction involving the $1500 check. Lankford testified that his campaign staff gave him the check and some cash one day at his campaign headquarters. (R9:29–30). Reverend Sutton, a member of the staff at that time, testified that another worker previously had picked up the check from Eastside Liquor Store. On the other hand, Sandra Hudson, the

employee at Eastside Liquor who wrote the check, testified that Lankford, himself, came to the store and told her to make the check out in his wife's name. Presented with the testimony of Lankford and Sandra Hudson, the jury had to decide what juries traditionally have decided, who was telling the truth. Lankford and Hudson's testimony was mutually exclusive; both could not be telling the truth. Unfortunately for Lankford, the jury decided against him.

The majority correctly asserts that a trial judge has broad discretion in admitting or excluding expert testimony and that his action is to be upheld unless manifestly erroneous. *United States v. Sans,* 731 F.2d 1521, 1530 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). In deciding whether to admit expert testimony, the fundamental test for the trial court is whether such evidence would "assist the trier of fact." [28] Explaining this standard, the advisory committee's note to Federal Rule of Evidence 702 states:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained laymen would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute. When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.

(citations omitted). As argued earlier, Count 24 presents the basic issue of whether Lankford or Wesley Merritt and Sandra Hudson are telling the truth. Since their inception, juries, not experts, have weighed the credibility of witnesses. Now is not the time to muddle the process.

The majority relies in part on the recent United States Supreme Court decision in *Cheek v. United States,* —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), to find

---

**28.** *See* Fed.R.Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

that Tokars' testimony is admissible. The *Cheek* Court considered the issue of whether a trial court committed error in instructing a jury to ignore the defendant's testimony explaining why he believed he did not have to pay taxes. The Court found that to prove a willful violation of the tax code, the Government must prove "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that the defendant voluntarily and intentionally violated that duty." *Id.* 111 S.Ct. at 610. In discussing the second prong, the defendant's knowledge, the Court held that a defendant's claim of ignorance of the law or of a misunderstanding of the law resulting in a good-faith belief that he was not violating the law negates the knowledge prong of proving willfulness whether or not the claimed belief or misunderstanding is objectively reasonable. *Id.* at 610–11. The Court then concluded the discussion with the language the majority cites to support its conclusion of admissibility, writing "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties." *Id.* at 611–12. From this the majority concludes that Tokars' testimony should be admitted as probative of the reasonableness of Lankford's actions. I disagree with this conclusion.

The question for the jury to decide in determining willfulness is whether the defendant was subjectively aware of the legal duty at issue, here, the duty to declare the $1500 as income. The key then is what did the defendant honestly believe at the time of the transaction. Consequently, evidence of reasonableness must have some connection with the actions of the accused. Conversely, Tokars wished to examine the transaction after its occurrence and to give his opinion that the transaction constituted a gift. Nothing in the record indicates that Lankford had any knowledge of the explanations Tokars offers. Such a *post facto*

analysis of events by an expert does nothing to aid the jury in determining the reasonableness of Lankford's beliefs when he was deciding whether the $1500 check was income or a gift. Additionally, nothing in *Cheek* supports the broad notion that expert testimony should be admitted to support the reasonableness of the defendant's belief that he is not violating the law. Consequently, the majority's reliance on the *Cheek* decision is misfounded.

Furthermore, the trial court properly excluded the expert testimony because admitting it would have violated Fed.R.Evid. 704(b),[29] which prohibits expert testimony on whether a defendant had the mental state constituting an element of the crime. Willfulness is the mental state required for the crime with which the defendant was convicted. *See* I.R.C. § 7206(1). The *Cheek* Court defined willfulness to mean "a voluntary, intentional violation of a known legal duty." *Cheek,* 111 S.Ct. at 610 (1991). In a previous case, the Court "ha[d] formulated the requirement of willfulness as bad faith or evil intent, ... or knowledge that the taxpayer should have reported more income than he did." *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973) (citations omitted).

Admittedly, the courts have had trouble determining in tax cases at what point an expert violates Rule 704(b). For example, in *United States v. Windfelder,* the Seventh Circuit held that an IRS agent's testimony that the defendant "intentionally understated his income" and was "well aware of what happened" to Windfelder's assets was inadmissible under Rule 704(b) because it impermissibly stated an opinion as to the defendant's knowledge or willfulness. *United States v. Windfelder,* 790 F.2d 576, 582 (7th Cir.1986). The Fifth Circuit in *United States v. Dotson,* conversely, found no error where an agent, while documenting consecutive increases in a defendant's net worth, testified that "[t]his is indica-

29. Fed.R.Evid. 704(b):
 No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or

did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

tive, and based on my experience shows to me, that he willfully and intentionally increased his income knowing full well that he had not reported the taxes due thereon." *United States v. Dotson,* 817 F.2d 1127, 1132–33, *vacated in part on other grounds,* 821 F.2d 1034 (5th Cir.1987). The court commented that this was a borderline statement, but found that the expert merely "explained his analysis of the facts indicating willful evasion, and did not, ... directly embrace the ultimate question...." *Id.* In yet a third case, the Ninth Circuit upheld a trial court's exclusion of expert testimony from an accountant who wanted to testify that a defendant charged with the failure to file income tax returns owed no taxes for the alleged period. *United States v. Brodie,* 858 F.2d 492, 495 (9th Cir.1988). The court held that this testimony would impermissibly state an opinion as to the taxpayers' willfulness and, accordingly, address the ultimate conclusion which was "the very question the jury had to answer from the law and the evidence." *Id.* at 495–96.[30]

The purpose of Mr. Tokars' testimony was that, if the facts were as the defendant argues, then the $1500 check was a gift. This conclusion is simply another way of stating that Lankford did not have the required mental state. If the only point Tokars wished to make was that this transaction was a gift then he only needed to discuss the donor's intent. *See Commissioner v. Duberstein,* 363 U.S. 278, 285, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218 (1960) (holding that the transferor's or donor's intent is the sole determinant of whether a transaction is a gift). Instead Tokars emphasized that the intent of the recipients was that this was a gift and that it was reasonable for Lankford to believe such. The evidence, however, could be interpreted as showing that Lankford personally went to the liquor store and had the check made out in his wife's name so that he

could use the money for his personal use. This was the issue for the jury to decide— whose version of the transaction was correct. The resolution of factual issues is always a matter for the jury. Tokars' testimony was nothing more than an opinion on whether Lankford willfully violated the tax laws, and accordingly, Rule 704(b) prohibits his testimony.

Prior to the enactment of Fed.R.Evid. 704(b), the Fifth Circuit discussed the use of expert testimony to contest willfulness in the case of *United States v. Garber,* 607 F.2d 92 (5th Cir.1979).[31] The *Garber* case involved a defendant who was selling her blood at very high prices. Garber was one of only two or three known people in the world with a certain antibody in her blood. The trial court refused to allow an expert to testify that a recognized theory of tax law supported the defendant's belief that the income from the sale of blood was not taxable. The Court of Appeals reversed and held that because of "its powerful impact on the issue of Garber's willfulness," the evidence that there were conflicting theories of tax liability should have been allowed to go to the jury. *Id.* at 99. In contrast to the *Garber* case, Lankford's defense does not argue that based on the same event or transaction the prosecution reaches one conclusion and the defense another. Instead Tokars uses one version of facts that are in controversy to argue that if the facts are as he assumes then this transaction is a gift.

Furthermore, the *Garber* opinion has been criticized as allowing uncertainty in the law to negate willfulness even when the defendant was unaware of the uncertainty. *See United States v. Harris,* 942 F.2d 1125, 1132 (7th Cir.1991) (arguing that testimony on the ambiguity of case law "on which defendant did not in fact rely is irrelevant because [in determining willfulness] only defendant's subjective belief is

---

**30.** The circuit court concurred in the district court's explanation that the effect of the accountant's testimony would have been "[t]o use that [testimony] to extrapolate to another position, and that is, the [taxpayers] believed they didn't have to pay taxes and that they were right

in their belief...." *United States v. Brodie,* 858 F.2d 492, 495 (9th Cir.1988).

**31.** Decisions of the Fifth Circuit rendered prior to October 1, 1981 are binding on the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).

at issue); *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir.1986) (arguing that "unless there is a connection between the external facts [ambiguity of the tax law] and the defendant's state of mind, the evidence of the external fact is not relevant"); *United States v. Mallas*, 762 F.2d 361, 364 n. 4 (4th Cir.1985) (holding that the uncertainty of the tax law is for the court to decide as an issue of law); *United States v. Ingredient Tech. Corp.*, 698 F.2d 88, 97 (2d Cir.1983) (agreeing with the dissent of Judge Ainsworth in *Garber*), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Lankford has presented no evidence that he attempted to discern the taxability of the $1500 check, but was confused by the tax law.

The Fifth and Eleventh Circuits themselves have narrowed *Garber* without expressly overruling it. *See United States v. Heller*, 866 F.2d 1336, 1342 (11th Cir.1989) (arguing that to apply *Garber* the uncertainty of the tax law must approach legal vagueness), *cert. denied*, 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989); *United States v. Burton*, 737 F.2d 439, 444 (5th Cir.1984) (holding that "apart from those few cases where the legal duty pointed to is so uncertain as to approach the level of vagueness, the abstract question of legal uncertainty of which a defendant was unaware is of marginal relevance"). There is no evidence that the law applied in this case is uncertain to the extent of being vague. Because of the distinction between *Garber* and this case and the suspect nature of the *Garber* decision, its mandates are not binding precedent.

In addition to relying on the *Cheek* and *Garber* opinions, the majority, as an alternative reason for admitting Tokars' opinion, finds that because the government asked Lankford's tax preparer the tax consequences of a hypothetical transaction, the defense should be able to pose its nine-part hypothetical to Tokars.[32] Nevertheless, the case law the majority cites does not support this conclusion. Two of the three cases cited, *United States v. Sellers*, 566 F.2d 884 (4th Cir.1977) and *Breidor v. Sears Roebuck & Co.*, 722 F.2d 1134 (3d Cir.1983), concern situations where the trial court excluded an expert's testimony on Federal Rule of Evidence 403 grounds. In this case, the trial court, in its discretion, concluded that the testimony would not aid the jury. The third case, *United States v. Parshall*, 757 F.2d 211 (8th Cir.1985), relies on the *Garber* decision which I have already criticized.[33] Interestingly, as I argue in this dissent, the *Parshall* court concluded that even though the trial judge erred in excluding the expert testimony, such exclusion was harmless error. *Id.* at 214. In addition to the case law not supporting the majority's conclusion, I believe the two hypotheticals pose different situations. The Government's question is highly probative because it was asked of the person who was preparing Lankford's tax returns during the period in issue. If Lankford had sought advice, this is what he would have been told. On the other hand, Tokars had nothing to do with Lankford or the preparation of his returns. His analysis is simply a retrospective look at the events. Because of the lack of supporting case law and the fundamental differences in the questions, I must reject the majority's "expert for an expert" theory in this context.

For the above reasons, the majority should have concluded that it was proper for the trial court to limit Tokars' testimony. Furthermore, because of the lengthy proffer taken by the trial court, the ques-

**32.** On redirect examination the following exchange between the prosecution and Lankford's tax preparer occurred:

Q. Mr. Powell, if this client, this taxpayer, Richard Lankford, had provided you information that "I received some campaign contributions last year and I deposited those into my personal account and spent them for personal costs that I had," would that have had an effect on a return prepared for him that particular year?

A. Yes.

Q. And what would the effect have been?

A. It should have been recorded as income.

**33.** The Ninth Circuit has noted that *"Parshall* carries little persuasive value because it relies on [*Garber*] which has been repudiated by other courts." *United States v. Brodie*, 858 F.2d 492, 496 n. 2 (9th Cir.1988).

tion of whether the testimony would assist the trier of fact, and the ambiguity of the application of Rule 704(b) in tax cases, it strains my mind to imagine how the trial court could have abused its discretion. The effect of today's decision will be to open the door in cases not involving a disease of the mind to expert testimony as to what a person was thinking at a certain point in time. Scientific analysis cannot answer that question. The jury after weighing all of the evidence must determine a defendant's mental state. The jury by its verdict found that Lankford willfully evaded his income tax. I cannot agree that in this instance the trial judge abused his discretion.

Again, as with the limitation on Mr. LeCroy's cross-examination, I ardently believe the exclusion of Tokars' testimony was harmless error. In contrast to the *Chapman* standard of concluding beyond a reasonable doubt that the constitutional error complained of did not contribute to the verdict obtained, a nonconstitutional error may be considered harmless if the error "did not substantially influence the verdict, and there was sufficient evidence to support the verdict apart from the error." *United States v. Calle*, 822 F.2d 1016, 1021 (11th Cir.1987) (quoting *Palmes v. Wainwright*, 725 F.2d 1511, 1518 (11th Cir. 1984)); *see also United States v. Montalvo–Murillo*, 495 U.S. 711, 110 S.Ct. 2072, 2080, 109 L.Ed.2d 720 (1990) (stating that nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a "substantial influence" on the outcome of the proceeding). Accordingly, the question is whether preventing Tokars from testifying substantially influenced Lankford being convicted.

As discussed earlier in brief, at trial, the prosecution presented the testimony of Wesley Merritt that he was solicited in the Fulton County Jail for a campaign contribution. He testified that he called the East Side Liquor Store, which he owned, and

told Sandra Hudson to give Lankford a check for $1500. Sandra Hudson testified that Lankford came to the store and told her to write the check to his wife. She did this and gave him the check.

In his defense, Lankford testified that a couple of campaign workers entered his office at his campaign headquarters and handed him the check with around $150 in cash, telling him that this was for his family. He then testified his wife used the money to pay some bills, the car insurance, and the car loan. The defense then presented a Reverend Gregory Sutton who testified that he was working in Lankford's campaign headquarters when the check came in. He testified that Sergeant Ross brought the check in and claimed to have gotten it from East Side Liquor Store. Finally, the defense called Mr. Tokars, who, in addition to his lengthy and complicated testimony concerning whether, in general, Lankford had been taking money, attempted to testify after a long hypothetical[34] based on the facts presented by the defense that this transaction was a gift. I must decide whether in the above context the exclusion of that opinion substantially influenced the outcome of the trial.

As previously argued, I do not believe that resolving this count called for complex legal analysis of the tax law. The versions of this transaction differ so much that the jury had to decide which witnesses to believe. The jury after weighing the credibility of the witnesses concluded that Lankford had willfully taken a campaign contribution and used it for his personal use. To reach this verdict, the jury had to reject the basic assumptions that were made for Tokars to give his opinion. Moreover, missing from the list of assumptions was any mention of the solicitation of Merritt for the contribution. Faced with the discrepancies between the foundation for the opinion given by Tokars[35] and what the jury believed in convicting Lankford, the exclusion of Tokars' opinion had no effect on the

---

34. See *supra* note 27.

35. The record indicates that to prepare for his testimony, Tokars interviewed the minister, the

Lankfords, and a few sheriff deputies. Noticeably missing from this list are Wesley Merritt, Sandra Hudson, and Jack LeCroy.

trial. I believe the evidence was so inconsequential that its exclusion would have met the *Chapman* reasonable doubt test, much less the lower standard of substantially influenced the trial. The fact is that Tokars was allowed to testify for forty pages of the record, that the judge listened to eighty-seven pages of the defense's proffer, and in the end excluded only a small portion of the testimony. As opposed to reversing this judge, he should be praised for his valiant effort to consider all sides of the issue before ruling. Therefore, I would have found no abuse of discretion, and even if there was error, that it would have met the harmless error standard.