[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17543

_____

D.C. Docket No. 9:07-cr-80021-DPG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KERRI L. KALEY,

Defendant - Appellant.

_____

No. 17-11061

_____

D.C. Docket No.  9:07-cr-80021-DPG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KERRI L. KALEY,

                                                        Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 8, 2019)

Before ROSENBAUM, HULL and, JULIE CARNES, Circuit Judges.

PER CURIAM:

This criminal case concerns a scheme to steal and resell prescription medical devices on the grey market. Its long procedural history includes prior trips to this Court. In a jury trial that occurred during the course of these earlier proceedings, Appellant Kerri Kaley was convicted of witness tampering, but the jury could not reach agreement on charges of conspiracy to transport stolen prescription medical devices, interstate transportation of stolen property, and money laundering. So more recently, in the latest chapter of this case, a jury trial on these remaining charges occurred. The jury found Kaley guilty on all counts, and she was later sentenced to 36 months' imprisonment. As relevant to this appeal, the district court also ordered Kaley to pay $821,420 in restitution.

2

Kaley now appeals her convictions on various grounds. First, Kaley asserts that the government violated her due-process rights by arguing a theory of prosecution against her that differed from the theory of prosecution it presented in a separate trial against one of her alleged coconspirators and by declining to allow Kaley to highlight this situation to the jury. Second, Kaley challenges the sufficiency of the evidence supporting her conviction for witness tampering in the original trial. Third, she contends that that the district court erred during her second trial when it limited cross-examination of a government witness and allowed the government to use a demonstrative chart during closing arguments. And finally, Kaley takes issue with the district court's calculation of the victim's losses and its order requiring Kaley to pay restitution in the amount of $841,420.

After careful consideration, and with the benefit of oral argument, we affirm in all respects.

## I.    Background

### A.    The Scheme

Kaley was employed by Ethicon Endo-Surgery, Inc. ("Ethicon"), as a supervisor who oversaw other Ethicon sales representatives. Ethicon, in turn, sold prescription medical devices ("PMDs") to its medical clients, such as hospitals.

As alleged by the government, Kaley conspired with her subordinates and directed them to stealthfully obtain significant quantities of PMDs from hospitals in

the New York area.  These hospitals were clients of Ethicon, and the coconspirator sales representatives were alleged to have taken the products from the hospitals without the hospitals' knowledge or permission.  According to the government, to effectuate the scheme, Kaley's sales representatives tricked hospitals into to buying more Ethicon products than they actually needed, so the hospitals would not miss supplies the coconspirators took from them.

The hospitals stored the boxed PMDs in supply rooms, and the sales representatives had access to these areas.  Through their access, the conspirator sales representatives were allegedly able to take products to provide to Kaley for resale on the grey market.  The evidence at trial ultimately revealed that once Kaley received the PMDs, she provided them to a company called F&S Medical, Inc. ("F&S"), located in Delray Beach, Florida.  F&S was owned and run by a former Ethicon employee, John Keith Danks, who sold the products on the grey market.

### B.    Procedural History

#### 1.    Kaley's Trials and Co-Conspirator Jennifer Gruenstrass's Trial

Kaley, her husband, and Kaley's co-worker Jennifer Gruenstrass were indicted for engaging in a conspiracy to transport stolen PMDs, interstate transportation of stolen property, conspiracy to commit money laundering, and witness tampering.  They pled not guilty and proceeded to trial in a piecemeal

4

fashion.  Other co-conspirators, including Danks, were charged separately for their participation in the scheme and pled guilty.

The government tried Gruenstrass individually in 2007, and the jury acquitted her of all charges (the "Gruenstrass Trial").[1]  Years later, in 2014, the government tried Kaley and her husband together.  At the conclusion of the trial, the jury found Kaley guilty of witness tampering, but the jury failed to reach a verdict on the other counts relating to conspiracy and theft (the "2014 Trial").  Kaley's husband was acquitted on the money laundering and witness tampering counts, but the jury was hung as to the remaining counts.[2]  The government decided to re-try Kaley separate from her husband, and that trial took place in 2016.  At the conclusion of Kaley's 2016 trial, the jury convicted Kaley of the remaining counts (the "2016 Retrial").  Because the evidence adduced at Kaley's 2016 Retrial is important to various issues in this appeal, we review that evidence here.

### 2.    Kaley's 2016 Retrial

During Kaley's 2016 Retrial, Danks testified that after working for Ethicon, he started his own business, F&S, which bought and sold existing medical devices. Danks explained that he began purchasing supplies from Kaley in around 2000, and

---

[1] We discuss the relevant details of Gruenstrass's trial later in this opinion, in addressing Kaley's contention that her due-process rights were violated when the government argued a theory of prosecution against her that differed from that presented against Gruenstrass.
[2] We discuss the relevant details of the 2014 Trial below, when we consider Kaley's argument concerning the sufficiency of the evidence supporting the witness-tampering conviction.

his business with Kaley halted near the end of 2004 or the beginning of 2005, when federal authorities raided his home.    Danks testified that he paid Kaley approximately $1.6 to $1.7 million from 2002 to 2004 for the products she provided. But he noted the value of these products he purchased from Kaley was approximately $10 million.

Three Ethicon sales representatives, who were part of the scheme, also cooperated and testified for the government during Kaley's 2016 Retrial.

Alan Schmidt testified that he was a sales representative for Ethicon and sold products to hospitals, including New York Methodist ("NYM").    According to Schmidt, beginning in 1998, Kaley solicited him to provide her with medical devices to sell for their mutual benefit.    Schmidt explained that without their authorization, he took products off shelves from hospitals in his territory, put those products in his bag, gave them to Kaley, and she sold them and paid him with checks.    Schmidt admitted entering hospitals and stealing products dozens of times.

Next, Frank Tarsia testified that, while working as a sales representative for Ethicon in the latter part of 2003 to the end of 2004, he was assigned to several New York hospitals, including NYM.    Like Schmidt, Tarsia recounted that he provided PMDs to Kaley to sell for their personal gain.    He stated, when he visited hospitals, he would simply walk out of the storage rooms with the products in a large bag.    To take the products without detection, Tarsia made inflated recommendations to

6

hospitals about the quantity of Ethicon products that they should order. Schmidt assisted Tarsia and superseded him as a sales representative for NYM. And Tarsia knew that Schmidt later supplied Kaley with medical devices as well. On cross-examination, Tarsia acknowledged that he previously told a grand jury that the PMDs he gave Kaley were extra products that the hospitals did not want and that he also gave her samples.

Finally, former sales representative Roni Keskinyan testified that she worked for Ethicon from 2001-2005 in the New York City area. Keskinyan explained that she acquired products for Kaley, who then paid her by check. As with the other representatives, Keskinyan admitted that she did not ask permission from the hospitals to take the products she provided to Kaley. Keskinyan also conceded that she lied to hospital staff—telling them that she needed the products for another hospital—to take the products.

In addition to these sales representatives, Michael Sharp, the director of materials management at NYM testified. He stated that in 2006, he became concerned about inventory control with respect to Ethicon products. He had been informed that a neighboring hospital had a loss issue and had the same sales representative, Frank Tarsia, which led him to investigate whether NYM had been victimized. Sharp contacted Ethicon and asked it to provide NYM with its spending data for 2003 to 2005, and it complied. Sharp double checked NYM's records and

7

found that the number of surgeries using Ethicon products was essentially flat but that a significant increase in the purchases of the Ethicon products had occurred in 2004.

The government attempted to introduce through Sharp a spreadsheet reflecting the numbers to which Sharp testified, but the court ruled that the spreadsheet was not admissible because neither Sharp nor NYM had prepared it. As a result, Sharp testified based on his recollection. Sharp testified that 94 procedures involving Ethicon products were performed in 2003, 96 in 2004, and 94 in 2005. Sharp reviewed NYM's financial data. He noted that the payments for devices used in those operations for 2003 were approximately $950,000, for 2004 were $2.1 million, and for 2005 were $1.3 million. Sharp could not explain why the expenditures varied so widely, but he noted that Tarsia was the sales representative for Ethicon during 2003 and 2004.

## II.    Discussion

**A.    The government did not violate Kaley's due-process rights by arguing a different theory of prosecution in Kaley's 2016 Retrial from the theory it pursued in the Gruenstrass Trial.**

We begin with Kaley's claim that the government presented inconsistent theories of prosecution in her 2016 Retrial, on the one hand, and in the 2007 trial of coconspirator Gruenstrass, on the other. In the Gruenstrass Trial, the government contended that the victim of theft was her employer, Ethicon. But in Kaley's trials,

8

the government asserted that the hospitals were the victims of the theft.  Kaley argues this change in the way the government argued its case violated her due-process rights, and she urges us to reverse and vacate her convictions.  Alternatively, Kaley claims she is entitled to a new trial at which she should be permitted to introduce statements made during the Gruenstrass Trial to highlight the government's allegedly inconsistent positions.  We disagree.

**1.**

We assume without deciding that we can dismiss an indictment or otherwise vacate a conviction based on the government's use of inconsistent theories of prosecution.  *See*, *e.g.*, *United States v. Dickerson*, 248 F.3d 1036, 1043 (11th Cir. 2001) (recognizing a line of cases that have raised concerns about the "Due Process implications of separate prosecutions for the same crime under contradictory theories or inconsistent factual premises.");[3]  *Drake v. Kemp*, 762 F.2d 1449, 1470 (11th Cir. 1985) (en banc) (Clark, J., concurring) (suggesting that the use of "totally inconsistent" theories in a case may constitute a "fundamental and egregious error" that violates due process).  *But see United States v. Hill*, 643 F.3d 807, 832 (11th Cir. 2011) (opining that "it is not at all plain that a defendant has a right to prevent

---

[3]  The panel in *Dickerson* noted that "neither the Supreme Court nor this court has addressed the constitutional implications of inconsistent litigation positions taken by the Government against defendants being tried separately for the same crime." *Dickerson*, 248 F.3d at 1043 n.6.

the prosecution from using inconsistent theories to prosecute two separately tried defendants charged with the same crime."); *Bradshaw v. Stumpf,* 545 U.S. 175, 190 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.").

But our assumption does not help Kaley. Although the government advanced different theories of who Kaley's victim was versus who Gruenstrass's was, under the evidence presented here, the theories of the case were not inherently contradictory or mutually exclusive, and both theories were consistent with the indictment.

Indeed, the theories were supported by the respective proof pertaining to each defendant. Gruenstrass's participation in the conspiracy appears to have differed from the other sales representatives' in an important respect: Gruenstrass purportedly acquired products with the hospitals' knowledge. When she did so, however, she was required to return these excess products to Ethicon. When Gruenstrass failed to return them, Gruenstrass's victim, as a matter of fact, was allegedly Ethicon, not the hospitals.

In contrast, during the 2014 Trial and 2016 Retrial, as we have explained, the government presented the testimony of coconspiring Ethicon sales representatives who admitted to primarily obtaining products by stealing from—and thus

victimizing—the hospitals they were supposed to service.  In other words, the conspiracy Kaley was convicted of had more than one victim, depending on the salesperson who acquired the ill-gotten goods.

Moreover, the government's filing reflected this from the outset.  The Superseding Indictment, for example, alleged that the coconspirators, "in the course of their activities as Ethicon employees and otherwise, without the knowledge of Ethicon, secured control and possession of significant quantities of [PMDs] . . . ."  It continued, "The PMDs were acquired through a variety of means, including, inter alia, retaining PMDs that were manufactured by companies other than Ethicon when medical facilities converted to the use of Ethicon devices; Ethicon manufactured PMDs recovered from customer facilities when alternative or later model versions were substituted for earlier models; acquisition of PMDs as 'samples' secured directly from Ethicon . . . ; and theft of said devices from the facilities of customers."

Similarly, when the government filed its original bill of particulars as to Gruenstrass, it alleged that the victims were both hospitals and Ethicon.  Only when Gruenstrass sought more specific information about the charges as they pertained to her alone did the government respond by stating that "solely with respect to the defendant . . . Gruenstrass, that the victim as to each of Counts 2 through 6 was Ethicon, Inc."  That the government apparently made a strategic decision to narrow its focus of its proof against Kaley to the PMDs stolen from the hospitals instead of

11

on all PMDs stolen and resold by the conspiracy, regardless of the particular victim, did not render its theories at Kaley's trials and the Gruenstrass Trial in conflict. *See United States v. Cornillie*, 92 F.3d 1108, 1110 (11th Cir. 1996) (per curiam) ("the government may plead the offense conjunctively and satisfy its burden of proof by any one of the means").

In fact, in both trials, the proof of *Kaley's* conduct was the same—she solicited sales representatives to take PMDs from hospitals and give them to her so she could arrange for Danks to sell the devices on the grey market. The government maintained consistently that Kaley and the sales representatives working for her had no right to take the products or resell them for personal gain, no matter who the victim was (Ethicon or the hospitals). This remained the government's unvarying position with respect to each of the trials. And regardless of whether Ethicon or the hospitals owned the PMDs, it was clear that Kaley did not.

Even during the government's opening statement in the Gruenstrass Trial, the government argued that Kaley was dealing in "stolen devices" since she had "no right, title and interest in any of that equipment that she was selling." This was the same position that the government took in Kaley's trials years later. Because the government's position in the 2016 Retrial was not fundamentally inconsistent with the theory advanced in the Gruenstrass Trial, no due-process violation occurred, and the district court properly denied Kaley's motion to dismiss the indictment.

12

**2.**

Kaley next asserts that even if she cannot prevail on her due-process argument, the district court still erred when it did not allow her to highlight the alleged change in the government's theory. She emphasizes that the government filed a bill of particulars in Gruenstrass's case in which it specifically identified Ethicon as the victim of theft. In Kaley's view, statements made by the government in Gruenstrass's case should be admissible under Rule 801(d)(2), Fed. R. Evid., as statements by a party opponent.

In support of her arguments, Kaley relies on *United States v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991), a case in which the Second Circuit allowed a defendant to introduce a bill of particulars against the government. Kaley also points to the Second Circuit's decisions in *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), and *United States v. Salerno*, 937 F.2d 797, 811 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317 (1992), where the court discussed circumstances under which statements by counsel may be admissible against a client. In *Salerno*, which also discussed the decision in *McKeon*, the Second Circuit stated that, in determining admissibility, it looks to (1) whether the prior statement involves a factual assertion inconsistent with the prosecution's later assertions in a subsequent trial; (2) whether the prosecutor's statements were the equivalent of a client's testimonial statements; and (3) whether the court can find by a preponderance of the evidence that the

13

inconsistent statement fairly supports the inference to be drawn and is not subject to innocent explanation. *Salerno*, 937 F.2d at 811.

These Second Circuit cases do not help Kaley. Even assuming without deciding that we should adopt their reasoning,[4] the circumstances here do not satisfy the Second Circuit's test.

In particular and as we have discussed, the government's statements in the Gruenstrass Trial do not involve factual assertions inconsistent with the prosecution's later assertions, even if we assume without deciding that they were the equivalent of a client's testimonial statements. In other words, no fundamental inconsistency existed between the government's theory of the case in the Gruenstrass Trial and Kaley's 2016 Retrial.

Plus, even if we were to overlook this deficiency in Kaley's argument, the district court was within its discretion when it alternatively barred these statements under Rule 403, Fed. R. Evid. Rule 403 permits district courts to exclude evidence

---

[4] Contrary to Kaley's assessment that we have "seemingly aligned" with *McKeon* and *Salerno*, we have not had reason to opine on that. *United States v. DeLoach*, 34 F.3d 1001 (11th Cir. 1994) (per curiam), a case upon which Kaley relies, does not demonstrate the contrary. Though the appellant there relied on the standard enunciated in *McKeon* and *Salerno*, *id.* at 1005, we did not adopt the Second Circuit's standard. Instead, we assumed, *without finding*, that the Second Circuit standard applied. *Id.* Kaley's reliance on our decision in *United States v. Kendrick*, 682 F.3d 974 (11th Cir. 2012), is also misplaced. In *Kendrick*, the panel pointed out that our decision in *DeLoach* "did not expressly adopt" the Second Circuit's standard, but rather, it merely concluded that, even assuming the standard applied, the defendant's argument failed. *Id.* at 987-88.

"if its probative value is substantially outweighed" by its prejudicial effect or risks of confusing the issues or misleading the jury.

Here, the district court reached the conclusion that any probative value of the statements was substantially outweighed by the statements' prejudicial effects. We cannot find that the district court erred when it made this determination.

To begin with, the probative value of the prosecutor's statements at the Gruenstrass Trial was low because the circumstances of that trial were quite different than at Kaley's 2016 Retrial. As we have noted, Gruenstrass contended that the hospitals voluntarily provided to her the products she sold to Kaley. In contrast, the coconspirators in Kaley's 2016 Retrial claimed that they "walked out" of the hospitals with products without the hospitals' knowledge.

Furthermore, the district court had already ruled that Kaley could not present Gruenstrass's acquittal to the jury, and introducing the challenged statements ran a serious risk of violating that ruling.

Finally, considering the scope of the conspiracy and the government's focus in Kaley's trials on the victimization of the hospitals, we cannot conclude that the district court abused its discretion in determining that allowing the presentation of statements extracted from the Gruenstrass Trial—a prosecution that focused on the harm to Ethicon as a victim—may well have misled or confused the jury. Consequently, even if these statements were otherwise admissible, the district could

15

did not abuse its discretion in excluding them under Rule 403, given their low probative value versus the potential creation of confusion. *See Kendrick*, 682 F.3d at 988 (upholding exclusion of prosecutor's statements at a prior trial because they posed high risks of confusing the jury by introducing "an entirely new set of evidence and hypotheses"); *see also United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990).

In sum, the government did not violate Kaley's due-process rights, and the district court did not err when it denied Kaley's request to refer to arguments made by the government in Gruenstrass's prior trial and in the revised Gruenstrass bill of particulars.

## B.   Evidence adduced at Kaley's 2014 Trial was sufficient to support her conviction for witness tampering.

Kaley also claims that the evidence presented at her 2014 Trial did not support a conviction for witness tampering under 18 U.S.C. § 1512(b)(3) and contends the government improperly referred to this count during proceedings as "obstruction of justice" rather than witness tampering because it recognized the weakness in its witness-tampering count. Kaley further asserts that the district court improperly instructed the jury and suggests the improper instruction played a part in Kaley's conviction for witness tampering. Again, we disagree.

**1.**

16

We review challenges to sufficiency of the evidence *de novo*, but in doing so assess the evidence in the light most favorable to the government. *United States v. Grzybowicz*, 747 F.3d 1296, 1304 (11th Cir. 2014). Section 1512(b)(3)—the statute under which Kaley was charged—provides as follows:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>
> **\*\*\***
>
> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . [shall commit a crime].

18 U.S.C. § 1512(b)(3). The term "misleading conduct" encompasses "knowingly making a false statement." *See* § 1515(a)(3)(A). To prove the offense of witness tampering, the government must show that the defendant knowingly and willfully (1) attempted to corruptly persuade a person, (2) with the intent to hinder, delay or prevent the communication of information to a federal official, (3) about the commission or the possible commission of a federal crime. *See United States v. Tampas*, 493 F.3d 1291, 1300 (11th Cir. 2007)). The record here reveals that the government met its burden to establish these elements.

Trial testimony established that Kaley knew as early as January 2005 that a federal agency was investigating her dealings with Danks and F&S Medical. During

17

this timeframe, following an FDA raid of Danks's house, Special Agent Julie Pohutsky went to Kaley's home to speak with her. At that time, Kaley indicated to Pohutsky that she was expecting to see her because Kaley's employer told her that a federal agent was coming to speak with her.[5] When Pohutsky spoke with Kaley, though, Kaley denied knowing Danks or ever having heard of F&S Medical. Kaley also denied that she ever shipped PMDs to Danks.

At around the same time, Danks placed a call to Kaley. The call was recorded because, at that time, Danks was already cooperating with the FDA. During the phone call, Kaley seemed nervous that her name had been given to the FBI[6] and asked Danks if he had provided her name to anyone. Kaley also stated, however, that she was "very confident" that her suppliers would not have provided her name to federal authorities.

Testimony[7] also revealed that Kaley had contacted her coconspirators (including Keskinyan, Tarsia, and Schmidt) at around the same time to meet and discuss the impending investigation. Keskinyan testified that in January 2005, Kaley called her because she was concerned that federal agents were coming to see her. As a result of this concern, Kaley scheduled meetings with her coconspirators.

---

[5] Kaley mistakenly thought the agency investigating the scheme was the FBI.

[6] Again, Kaley mistakenly thought the agency was the FBI, not the FDA.

[7] Because Kaley was convicted of witness tampering during the 2014 Trial, all testimony cited in this opinion comes from the testimony of witnesses during that trial.

According to Keskinyan, during the meetings, the group discussed concealing that they were engaged in the theft of PMDs and agreed to tell a uniform story if questioned. The group also discussed obtaining "burner phones" so they could communicate among themselves without being detected. Keskinyan further reported during her testimony that Kaley told the group not to talk to federal agents if contacted, but if they were pressed by agents, to tell a "false story" that the hospitals were giving them some of the PMDs because they did not need them anymore. Finally, Keskinyan testified that she agreed not to tell the truth.

Tarsia corroborated the testimony that Kaley had called various meetings with the coconspirators after she realized that federal investigators were on to her. Tarsia indicated that Kaley called him and told him that there "might be a problem" and that they "should get together." According to Tarsia, Kaley sounded "concern[ed]" and "scared." Tarsia described various meetings during which the coconspirators agreed to "stick-to-the-same-story"[8] about the products they were stealing (*i.e.*, that they were receiving sample products from the hospitals), and the coconspirators agreed to lie. Tarsia also recounted how Kaley had called a later meeting with the group, and they again discussed concealing what happened with the products.

---

[8] Kaley asserts that Tarsia's testimony about "stick[ing] to the same story" "occurred in the context of [Kaley's] talking with her 'superiors' at Ethicon and not law enforcement." We have carefully reviewed the testimony and disagree. Tarsia's testimony concerns Kaley's instructions to the coconspirators at a meeting she called and held in her living room; it does not purport to represent that Kaley said her "superiors" at Ethicon told her to "stick to the same story."

Finally, Tarsia testified that he assisted Kaley and her husband with moving the stock of Ethicon PMDs from the Kaleys' garage so that law-enforcement agents would not find the products.

Schmidt, who was also present at the meetings, agreed that Kaley called these meetings after being "tipped off" about the investigation. Schmidt did not recall a discussion of telling a false story to agents but testified that the group discussed obtaining burner phones so their conversations would not be detected by federal agents.

This evidence, taken in the light most favorable to the government, supports a finding of witness tampering under § 1512(b)(3). To establish a violation of § 1512(b)(3), the government merely had to show that Kaley attempted to persuade a person to hinder or prevent the communication of information to a federal official. The jury could reasonably have believed the witnesses when they testified that Kaley called various meetings, instructed coconspirators to refuse to speak to law-enforcement officers, and directed coconspirators who did to stick to a false narrative.

Although Kaley argues that the meetings with coconspirators occurred before federal agents met with her, that does not defeat the § 1512 conviction. The evidence supported a finding that, at the time she called the meetings and instructed her coconspirators to lie, Kaley knew federal agents were looking into the scheme and

20

intended to visit her.  A conviction under § 1512(b)(3) does not require proof that a federal investigation was ongoing at the time of the statement.  *See United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir. 2006).  The jury also fairly concluded based on the evidence that a reasonable likelihood existed that members of the group would be contacted and would communicate with federal authorities once contact was made.  *See United States v. Chafin*, 808 F.3d 1263, 1274 (11th Cir. 2015)).

Sufficiency of the evidence does not require that the evidence be inconsistent with "every reasonable hypothesis except guilt."  *See United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995) (per curiam) (citation omitted).  So, the witnesses' accounts need not be precisely the same.  Here, while the witness accounts of the meetings were not exactly the same with respect to the number of meetings and where the meetings occurred, all of the witnesses testified that Kaley called the meetings in early 2005 and that she did so to discuss the impending or ongoing federal investigation into the scheme.

Keskinyan and Tarsia also agreed that the purpose of the meeting was to get everyone on the same page and prevent federal agents from learning the truth. Keskinyan explained the specifics of what Kaley instructed the group to say—not to communicate with law enforcement and if such communication was necessary, to tell a false story.  And while the government did not specifically ask Tarsia if Kaley

21

gave this instruction, the take-away from his testimony was that Kaley did.  This evidence was sufficient to find Kaley guilty of witness tampering.

**2.**

We also reject Kaley's assertion that a flawed jury instruction played a role in her conviction for witness tampering.  Kaley's primary argument is that the district court omitted two "crucial aspects" of the witness-tampering charge when it instructed the jury.  First, Kaley claims that the district court did not require jury unanimity as to the specific witness with whom Kaley tampered.  Second, Kaley argues that the district court failed to instruct the jury that it was required to find a reasonable likelihood "that the information would have been provided to a federal law enforcement officer or federal judge."

Kaley did not make these objections at trial, so we review the jury instructions for plain error.  Under plain-error review, Kaley must show that (1) the district court committed error; (2) the error was plain; and (3) the error affected her substantial rights.  *United States v. Olano*, 507 U.S. 725, 730-32 (1993).  It falls within our sound discretion whether to correct any forfeited error; we do not exercise our discretion unless the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *Id.* at 732 (citation omitted).  Because we find no plain error, we reject Kaley's arguments.

22

"Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts . . . ." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (internal quotation marks and citation omitted). And we "will not reverse a conviction . . . unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Id.* (internal quotation marks and citation omitted).

At the time of Kaley's trial, no pattern jury instruction existed for individuals accused of violating § 1512(b)(3). Nevertheless, the jury instruction provided by the district court directly tracked the language of the statute.[9] Thus, there was no error—let alone plain error—in the substance of the jury instruction.

---

[9] The district court instructed the jury, in relevant part, as follows:

> It's a Federal crime for anyone to corruptly persuade another person, or attempt to do so, with intent to delay or prevent the communication to a law enforcement officer of the United States information relating to the commission or possible commission of a Federal offense.
>
> A Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
> First:   That the Defendant corruptly persuaded another person, or attempted to do so;
>
> Second: That the Defendant did so knowingly and with the intent to delay or prevent the communication of information to a law enforcement officer of the United States;

23

As to Kaley's argument that the jury was not instructed that it unanimously must agree as to the person or persons influenced by Kaley, we need not decide that issue. Even assuming without deciding that the district court's failure to do so constituted plain error, on this record, we cannot say that any such error substantially affected Kaley's rights. The evidence of witness tampering, as summarized above, was overwhelming, and Keskinyan and Tarsia each effectively testified that Kaley had tampered with them at the same meeting, instructing them to avoid speaking with law enforcement and if they couldn't, to lie. For these reasons, Kaley's argument concerning jury unanimity cannot succeed under a plain-error standard.

Kaley's argument that the jury should have been instructed that it had to find a reasonable likelihood that "the information would have been provided to a federal law-enforcement officer or a federal judge" also fails, as it does not meet plain-error review. While a true statement and Kaley arguably may have been entitled to such an instruction had she requested it, Kaley has not pointed to any binding case that required the district court to *sua sponte* provide this instruction in a § 1512(b)(3) prosecution. *See United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (per

---

Third: That such information related to the commission or possible commission of a Federal offense.

To corruptly persuade means to act knowingly and dishonestly with the specific intent to influence, obstruct, or impede the due administration of justice.

24

curiam) ("[A]n error cannot meet the 'plain' requirement of the plain error rule if it is not clear under current law.") (citation omitted). And even if the district court plainly erred by not giving the instruction, we cannot say that any such error affected Kaley's substantial rights; sufficient evidence existed for the jury to find that it was reasonably likely that the coconspirators would have provided information to federal agents had Kaley not instructed them otherwise.

For all of these reasons, we conclude that the district court did not commit reversible error when it instructed the jurors as to the witness-tampering count.

**C.    Even assuming the district court erred by restricting Kaley's cross-examination of a witness during her 2016 Retrial, any such error was harmless.**

Next, Kaley asserts that the district court erred when it restricted her cross-examination of cooperating witness Frank Tarsia. As we have already noted, during his trial testimony, Tarsia testified that Kaley asked him to take PMDs from hospitals so the devices could be sold on the grey market. More particularly, Tarsia testified that, in order to accomplish this goal, he "walked out" of hospitals with PMDs and sold the items to Kaley. During Tarsia's prior sentencing hearing, however, his lawyer sought leniency from the sentencing court on the ground that Tarsia did not actually steal the PMDs, but rather, the hospital gave Tarsia excess products.

During Kaley's trial, her counsel sought to impeach Tarsia by cross-examining him about his counsel's prior statements. In particular, Kaley's counsel

25

wished to point out that although Tarsia testified in Kaley's 2016 Retrial that he took the PMDs without permission, during his own sentencing, his lawyer claimed that the hospitals made the PMDs available to Tarsia.  The district court did not allow the line of questioning.  Kaley claims this was error because the lawyer's statements on behalf of Tarsia during his sentencing are admissible under Federal Rules of Evidence 801(d)(2)(D) and 801(d)(2)(C), as statements of a party opponent's agent and statements made by a person authorized by a party to make a statement concerning the subject.  By limiting the cross-examination of Tarsia, Kaley argues that the district court violated her right to confrontation since she was not able to expose that Tarsia may have been shading his testimony during Kaley's trial in an effort to curry favor with the government.

We review a district court's evidentiary rulings for a clear abuse of discretion. *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992).  A trial court has "broad discretion under Federal Rule of Evidence 611(b) to determine the permissible scope of cross-examination." *Id.* (citation omitted).  But this discretion is subject to the requirements of the Sixth Amendment. *Id.*  The Sixth Amendment's right of confrontation includes the right of cross-examination. *Id.*  The purpose of cross-examination, of course, is typically to impeach or discredit the witness, particularly where the witness has an incentive to cooperate with the government. *Id.*  We have said that "[w]hat counts is whether the witness may be shading his

26

testimony in an effort to please the prosecution." *Id.* (citation omitted). Once sufficient cross-examination occurs, the district court may limit further cross-examination in its discretion. *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994).

We assume without deciding that the district abused its discretion when it disallowed the cross-examination of Tarsia with respect to the prior statements made by his lawyer during sentencing. When such an error occurs, the harmless-error doctrine applies. *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000). Under that inquiry, we must ask "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Whether an error is harmless depends on factors including the following:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case.

*Id.*

Here, any error that occurred was harmless because, although Tarsia was a key government witness, he provided cumulative testimony, substantial other

27

evidence admitted during trial supported Tarsia's testimony that the sales representatives stole products from the hospitals, the cross-examination that the district court allowed provided a basis to challenge Tarsia's credibility (because he admitted to inconsistent testimony before the grand jury), and the overall evidence of Kaley's guilt was strong. *See e.g., United States v. Mills*, 138 F.3d 928, 939 (11th Cir. 1998).

First, Kaley's attorney was permitted to cross-examine Tarsia concerning his involvement in the scheme and whether he had authority to take the PMDs or not. And he was not restricted from asking Tarsia directly what his involvement in the scheme was and whether he "stole" the items. But perhaps most importantly, on cross-examination, Tarsia acknowledged that he previously told a grand jury that the PMDs he gave Kaley were extra products that the hospitals did not want and that he also gave her samples. So even if though the jury did not hear of Tarsia's counsel's statements during Tarsia's sentencing, it nonetheless heard how Tarsia changed his story. As a result, further cross-examination would have been cumulative.

Plus, other witnesses testified that they stole PMDs from hospitals and gave them to Kaley so the items could be sold on the grey market. Like Tarsia, both Schmidt and Keskinyan testified that they took PMDs from hospitals without permission. According to Schmidt, he took products off hospital shelves, gave them to Kaley, and she sold them and paid him with checks. Just like Tarsia, Schmidt

28

said that he put the products in his bag and walked out of the hospital. And he indicated he stole products from hospitals dozens of times.

Likewise, Keskinyan testified that she acquired products from hospitals for Kaley, who then paid her by check. Keskinyan admitted that she did not ask permission from the hospitals to take the products. And she admitted that she lied to hospital staff—falsely telling them that she needed the products for another hospital—in order to take the products.

Finally, Sharp's testimony sufficiently supported the finding that Tarsia stole from NYM when he was a sales representative. The dramatic spike in expenses for Ethicon products during a period of time when surgeries remained constant would permit the jury to find that Tarsia stole from NYM.

In short, on this record, the restriction on the cross-examination did not constitute reversible error.

**D.    The district court did not err when it permitted the government to use a demonstrative chart during closing arguments.**

Kaley challenges the district court's decision to allow the government to use during closing arguments a chart summarizing (1) NYM's purchase of Ethicon products during a three-year period and (2) the number of bariatric surgeries performed during that same period. To assist the jury in digesting Sharp's testimony, the prosecutor sketched the chart while Sharp, NYM's director of materials management, testified on direct examination. Kaley objects that the prosecution

29

created the chart as an end-run around the district court's exclusion of a spreadsheet created by Ethicon that contained the same information.[10]  According to Kaley, the chart was misleading and contained hearsay, so the district court should not have allowed the government to use it to support its contention that $1 million's worth of PMDs had been stolen from NYM.

When a defendant preserves an objection by contemporaneously objecting, we review for abuse of discretion.  In determining whether the district court abused its discretion, we look to see if it "made a clear error of judgment . . . or . . . applied an incorrect legal standard."  *Peat*, *Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004) (citation and internal quotation marks omitted).  We assume without deciding that Kaley appropriately preserved her objection to the government's use of this exhibit.[11]  Nevertheless, Kaley cannot prevail on her argument even under this standard.

Typically, Rule 1006, Fed. R. Evid., governs the use of summary charts.  That Rule provides that, for the sake of convenience, a party can use summary charts to present in court "otherwise voluminous" information.  Rule 1006, Fed. R. Evid.

---

[10] As we have noted, the district court excluded the spreadsheet because neither Sharp nor NYM generated it.

[11] Kaley contends the abuse-of-discretion standard applies because she objected to the government's use of the chart before its use during closing arguments.  But the government claims the plain-error standard governs.  According to the government, the timing of Kaley's objection was "too late," since Kaley did not object to the chart as it was sketched during Sharp's direct examination.  We need not decide whether Kaley appropriately preserved her objection because, even assuming she did, her argument still fails under the less onerous abuse-of-discretion standard.

30

Once admitted, a Rule 1006 exhibit constitutes substantive evidence. *See Peat*, 378 F.3d at 1159.

Here though, the summary chart was not admitted as evidence; rather, it was employed as a demonstrative aid. Where a chart serves as a demonstrative aid only, Rule 611(a), Fed. R. Evid., controls. Rule 611(a) provides, among other things, that a court may exercise "reasonable control over the mode of . . . presenting evidence" so as to make the procedures "effective for determining the truth" and to "avoid wasting time." *See* Rule 611(a), Fed. R. Evid. As the Advisory Committee Notes to the 1972 proposed rule explain, the judge is to employ "common sense and fairness in view of the particular circumstances" in ensuring the use of "procedures effective for determining the truth." Fed. R. Evid. 611(a) advisory committee's note to 1972 amendment.

The district court did not abuse its discretion when it allowed the government to use the chart during closing arguments. The chart merely reflected Sharp's testimony that a significant jump in the amount of money NYM spent on bariatric-surgery equipment occurred during 2004. More specifically, the government memorialized Sharp's testimony in the chart as follows:  (1) in 2003, 94 bariatric surgeries were performed, and NYM spent approximately $950,000 on the PMDs used for those surgeries; (2) in 2004, 96 bariatric surgeries were performed, and NYM spent approximately $2.1 million on the PMDs used for those surgeries; and

31

(3) in 2005, 94 bariatric surgeries were performed, and NYM spent approximately $1.3 million on the PMDs. The chart set forth in visual form Sharp's testimony that, even though the number of surgeries remained almost the same, the costs NYM incurred during 2004 for PMDs more than doubled.

Significantly, Kaley never argued that the prosecutor inaccurately transcribed Sharp's testimony. We find the use of the chart was akin to the government's use as a demonstrative aid of an enlarged copy of a portion of a transcription of a witness's testimony during trial. We disagree with Kaley's assertion that the government's use of the chart was misleading and that it contained inadmissible hearsay. In fact, the chart represented testimony that occurred during Kaley's trial, and Sharp explained in detail in his testimony how he independently researched and confirmed the information originally set forth in Ethicon's spreadsheet before he testified to the numbers of surgeries performed and the costs of PMDs incurred for those surgeries.

Nor was there anything unfair or surprising about the government's use of the chart. As we have noted, the chart reflected Sharp's trial testimony. Sharp was subject to cross-examination, and during cross-examination, Kaley's counsel did not challenge Sharp about the correctness of the numbers to which he testified. Moreover, Kaley possessed the information from Ethicon that was consistent with Sharp's testimony because it had the Ethicon spreadsheet for years prior to Kaley's 2016 Retrial. Indeed, the spreadsheet was used in Kaley's 2014 Trial and was

32

admitted without objection during that trial. And Sharp testified at the 2016 Retrial to substantially the same sales numbers at which Ethicon arrived.

Finally, any argument by Kaley that the summary chart unfairly left the jury with the impression that theft had been committed at NYM is without merit. As we have noted, aside from the sketched chart, abundant evidence supported the conclusion that the conspiracy stole items from NYM. Tarsia himself testified that while he was the sales representative for NYM, he "walked out" with products without permission and gave them to Kaley, who provided him with checks in return. As Tarsia explained, he carried the products out of the hospital in a "large bag" to hide the theft.

For these reasons, we conclude that the district court did not abuse its discretion when it allowed the government to use the summary chart during closing arguments.

**E.    The restitution amount selected by the district court was a reasonable estimate of the amount of loss based on the evidence.**

Finally, Kaley challenges the order of restitution entered by the district court following her conviction, which required Kaley to pay $841,420 to NYM for its loss. According to Kaley, the amount of restitution selected was based solely on the inference that the "uptick" in NYM's orders for PMDs in 2004 constituted the actual loss suffered by the hospital. Kaley contends that the restitution order should be

33

reversed because the district court did not base the restitution amount on the actual loss to NYM. We disagree.

We review *de novo* the legality of a district court's restitution order, and we review for clear error the underlying factual findings. *United States v. Baldwin*, 774 F.3d 711, 728 (11th Cir. 2014). The amount of a restitution award "must be based on the amount of loss actually caused by the defendant's conduct." *Id.* (quoting *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001)). But because the determination of a restitution amount is an "inexact science," *United States v. Huff*, 609 F.3d 1240, 1248 (11th Cir. 2010), the government need not "calculate the victim's actual loss with laser-like precision, but may instead provide a reasonable estimate of that amount." *United States v. Martin,* 803 F.3d 581, 595 (11th Cir. 2015) (citation and internal quotation marks omitted). Consequently, where difficulties arise in establishing the exact amount of restitution, a district court may accept a "reasonable estimate" of the loss based on the evidence presented. *See United States v. Futrell,* 209 F.3d 1286, 1291-92 (11th Cir. 2000) (per curiam) (holding that the district court did not abuse its discretion in relying on a reasonable estimate of the loss the defendant caused to the government in fraudulently obtaining disability payments when calculating his earning capacity necessarily required an estimate); *see also Baldwin,* 774 F.3d at 728-29.

34

The government bears the burden of establishing the amount of a victim's loss by a preponderance of the evidence. *Futrell,* 209 F.3d at 1290; *see also* 18 U.S.C. § 3664(e). The district court must explain its findings with "sufficient clarity" to allow this Court to perform its function adequately on appellate review. *Huff*, 609 F.3d at 1248. Loss and restitution calculations may be based on evidence heard during trial, undisputed statements in the PSI, or evidence presented at the sentencing hearing. *Baldwin*, 774 F.3d at 727-28. With these principles in mind, we affirm the district court's restitution order.

At the restitution hearing, the government relied on Sharp's trial testimony about NYM's purchase of endo-mechanical devices during the period when Tarsia (and Schmidt) admitted to stealing devices from NYM. The government noted that Tarsia began his theft in December 2003—as reflected in checks from Kaley—and ended in December 2004. Sharp testified that, although the number of bariatric surgeries involving Ethicon products remained mainly constant from 2003 to 2005, the amount NYM paid for the products rose from approximately $950,000 in 2003 to approximately $2.1 million in 2004, and then dropped again (after Tarsia's departure as a representative) to around $1.3 million in 2005.

Sharp also testified that Tarsia was the sales representative for Ethicon during 2003 and 2004, and Tarsia himself admitted he stole products from NYM and sold them to Kaley until the end of 2004. Sharp further testified that he ruled out the

35

possibility that the uptick in the amount paid for the products could have been due to an increase in the number of surgeries. As Sharp explained, he reviewed operating-room records, which reflected that the number of bariatric surgeries remained the same throughout the period.

Although Kaley contends that the government did not sufficiently prove that the increase in sales was caused exclusively by Tarsia's theft, she does not suggest a plausible alternative as to why NYM paid almost double for the Ethicon products in 2004 than it did in 2003. Nor does she explain why the amount spent sharply decreased following Tarsia's departure in 2005. For this reason, any theory that the cost increase may have resulted from an increase in the price of products (rather than from the purchase of additional products to account for the thefts) fails since the amount paid by NYM decreased dramatically in 2005, even when the number of surgeries remained the same. Under these circumstances, it was reasonable for the district court to conclude that the uptick in costs resulted from theft.

We also conclude the $841,420 restitution amount reflects a reasonable estimate based on Sharp's and Tarsia's trial testimony and the Ethicon spreadsheet numbers. [12] The district court explained that it arrived at this amount by taking into account the expenditures on NYM's expenditures on Ethicon "Endo-medical only

---

[12] The district court used the figures set forth in the spreadsheet made by Ethicon (that was not admitted into evidence during trial). These figures were more precise than the ones testified to by Sharp.

equipment" in 2004 versus those in 2005. As the district court noted, the money spent on devices in 2004 substantially increased to $2,155,690, and the next year it went down to $1,314,270. The district court subtracted the 2005 figure from the 2004 one to arrive at the restitution amount ($2,155,690 - $1,314,270 = $841,420). We agree with the district court's assessment that the $841,420 figure is a conservative estimate, in light of the value of the stolen devices and the amount Danks paid Kaley. We find no error.

## III.    Conclusion

For the foregoing reasons, we affirm Kaley's convictions and the restitution order.

**AFFIRMED.**